## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KATHY MARIE LIGHT, | : | CIVIL NO.: 1:23-cv-01383 |
| | : | |
| Plaintiff, | : | (Magistrate Judge Schwab) |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MARTIN O'MALLEY, [1] | : | |
| Commissioner of Social Security, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### I.  Introduction.

In this social security action, Plaintiff Kathy Marie Light seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claims for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. We have jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3).  For the reasons

---

[1] Martin O'Malley is now the Commissioner of Social Security, and he is automatically substituted as the defendant in this action. *See* Fed. R. Civ. P. 25(d) (providing that when a public officer sued in his or her official capacity ceases to hold office while the action is pending, "[t]he officer's successor is automatically substituted as a party"); 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

set forth below, we will affirm the Commissioner's decision and enter judgment in favor of the Commissioner.

## II. Background and Procedural History.

We refer to the transcript provided by the Commissioner. *See docs. 7-1* to *7-7.*[2]  On May 11, 2021, Light protectively filed[3] an application for disability insurance benefits and an application for supplemental security income, alleging that she has been disabled since March 18, 2021. *See Admin. Tr.* at 15.  After the Commissioner denied her claims at the initial and reconsideration levels of administrative review, *id*. at 120–33, 142–49, Light requested an administrative hearing, *id.* at 150–51.  In July 2022, Light, who was represented by counsel, as well as a vocational expert testified via video at a hearing before Administrative Law Judge Randy Riley (the "ALJ"). *Id*. at 35–59.  In August 2022, the ALJ denied Light's claims for benefits. *Id*. at 12–34.  Light appealed the ALJ's decision to the Appeals Council, which denied her request for review. *Id*. at 1–6.  This

---

[2] Because the facts of this case are well known to the parties, we do not repeat them here in detail.  Instead, we recite only those facts that bear on Light's claims.

[3] "Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits." *Stitzel v. Berryhill*, No. 3:16-CV-0391, 2017 WL 5559918, at *1 n.3 (M.D. Pa. Nov. 9, 2017).  "A protective filing date allows an individual to have an earlier application date than the date the application is actually signed." *Id*.

makes the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court.

In August 2023, Light, represented by counsel, began this action by filing a complaint claiming that the ALJ erred and abused his discretion, and the Commissioner's decision is not supported by substantial evidence. *See Doc. 1 ¶¶* 13–28. She requests that the court reverse the Commissioner's decision and award her benefits or, in the alternative, grant such other relief as may be deemed justified. *Id*. at 6 (Wherefore Clause).

The parties consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c), and the case was referred to the undersigned. *Doc. 5*. The Commissioner then filed an answer and a certified transcript of the administrative proceedings. *Docs. 6, 7*. The parties filed briefs, *see docs. 9, 12*, and this matter is ripe for decision.

## III.  Legal Standards.

### A. Substantial Evidence Review—the Role of This Court.

When reviewing the Commissioner's final decision denying a claimant's application for benefits, "the court has plenary review of all legal issues decided by the Commissioner." *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). But the court's review of the Commissioner's factual findings is limited to whether

substantial evidence supports those findings. *See* 42 U.S.C. § 405(g); *Biestek v. Berryhill*, 587 U.S. 97, 99 (2019).  "[T]he threshold for such evidentiary sufficiency is not high." *Biestek*, 587 U.S. at 103.  Substantial evidence "means— and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

Substantial evidence "is less than a preponderance of the evidence but more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995).  A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's] finding from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966).  "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F.Supp.2d 623, 627 (M.D. Pa. 2003).

The question before this court, therefore, is not whether Light is disabled, but whether substantial evidence supports the Commissioner's finding that she is not disabled and whether the Commissioner correctly applied the relevant law.

## B.  Initial Burdens of Proof, Persuasion, and Articulation.

To receive benefits under Title II or Title XVI of the Social Security Act, a claimant generally must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. §1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a).  To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1505(a), 416.905(a).

Further, to receive disability insurance benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which

he or she was last insured. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a).[4]  Unlike

with disability insurance benefits under Title II of the Social Security Act,

"[i]nsured status is irrelevant in determining a claimant's eligibility for

supplemental security income benefits" under Title XVI of the Social Security Act.

*Snyder v. Colvin*, No. 3:16-CV-01689, 2017 WL 1078330, at *1 (M.D. Pa. Mar.

22, 2017).  Supplemental Security Income "is a federal income supplement

program funded by general tax revenues (not social security taxes)" "designed to

help aged, blind or other disabled individuals who have little or no income." *Id*.

The ALJ follows a five-step sequential-evaluation process to determine

whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a), 416.920(a).  Under this

process, the ALJ must sequentially determine: (1) whether the claimant is engaged

in substantial gainful activity; (2) whether the claimant has a severe impairment;

(3) whether the claimant's impairment meets or equals a listed impairment;

(4) whether the claimant is able to do his or her past relevant work; and

(5) whether the claimant is able to do any other work, considering his or her age,

---

[4] "Disability insurance benefits are paid to an individual if that individual is disabled and 'insured,' that is, the individual has worked long enough and paid social security taxes." *Jury v. Colvin*, No. 3:12-CV-2002, 2014 WL 1028439, at *1 n.5 (M.D. Pa. Mar. 14, 2014) (citing 42 U.S.C. §§ 415(a), 416(i)(1)).  "The last date that an individual meets the requirements of being insured is commonly referred to as the 'date last insured.'" *Id*. (citing 42 U.S.C. § 416(i)(2)).  Here, the ALJ determined that Light met the insured-status requirements through March 31, 2026. *Admin. Tr*. at 16, 17.

education, work experience, and residual functional capacity ("RFC"). 20 C.F.R.

§§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v).

The ALJ must also assess a claimant's RFC at step four. *Hess v. Comm'r of Soc. Sec.*, 931 F.3d 198, 198 n.2 (3d Cir. 2019).  The RFC is "'that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)); *see also* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  In making this assessment, the ALJ considers all the claimant's medically determinable impairments, including any non-severe impairment identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2).

"The claimant bears the burden of proof at steps one through four" of the sequential-evaluation process. *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010).  But at step five, "the burden of production shifts to the Commissioner, who must . . . show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity." *Fargnoli v. Massanari*, 247 F.3d 34, 39 (3d Cir. 2001).

The ALJ's disability determination must also meet certain basic substantive requisites.  Most significantly, the ALJ must provide "a clear and satisfactory

7

explication of the basis on which" his or her decision rests. *Cotter v. Harris*, 642

F.2d 700, 704 (3d Cir. 1981).  "The ALJ must indicate in his decision which

evidence he has rejected and which he is relying on as the basis for his finding."

*Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F. 3d 429, 433 (3d Cir. 1999).  The

"ALJ may not reject pertinent or probative evidence without explanation." *Johnson*

*v. Comm'r of Soc. Sec.*, 529 F.3d 198, 204 (3d Cir. 2008).  Otherwise, "'the

reviewing court cannot tell if significant probative evidence was not credited or

simply ignored.'" *Burnett*, 220 F.3d at 121 (quoting *Cotter*, 642 F.2d at 705).

## IV.  The ALJ's Decision.

On August 4, 2022, the ALJ denied Light's claims for benefits. *Admin. Tr.* at

12–34.  He proceeded through the fourth step of the five-step sequential-evaluation

process.

### A.  Step One.

At step one of the sequential-evaluation process, the ALJ found that Light

had not engaged in substantial gainful activity since her alleged onset date of

March 18, 2021. *Id.* at 1.

**B.  Step Two.**

At step two of the sequential-evaluation process, the ALJ found that Light

had the following severe impairments: lumbar degenerative disc disease, diabetes

mellitus with neuropathy, and obesity. *Id*. at 17.  He also found that although Light

had a history of psoriasis, right knee pain and prior knee surgery, rheumatoid

arthritis, high cholesterol, high blood pressure, hip and pelvis degenerative joint

disease, those impairments were not severe. *Id*. at 18.

The ALJ further found that Light's anxiety and depression were not severe

impairments. *Id*.  In making this finding, the ALJ reviewed the report of

consultative examiner John Miller, Ph.D. *Id*. at 18–19.  He also "considered the

broad functional areas of mental functioning set out in the disability regulations for

evaluating mental disorders and in the Listing of Impairments." *Id*. at 19.  As to the

"four broad functional areas" "known as the 'paragraph B' criteria," the ALJ

concluded that Light had only mild limitations in each area. *Id*. at 19–20.  He

concluded that because Light's "medically determinable mental impairments cause

no more that 'mild' limitation in any of the functional areas <u>and</u> the evidence does

not otherwise indicate that there is more than a minimal limitation in [Light]'s

ability to do basic work activities," her anxiety and depression were not severe

impairments. *Id*. at 20.  The ALJ recognized that the "paragraph B" criteria are not

an RFC; rather, they "are used to rate the severity of mental impairments at steps 2

and 3 of the sequential evaluation process[,]" and the RFC "assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment." *Id.* And he asserted that his RFC that follows "reflects the degree of limitation" he "has found in the 'paragraph B' mental function analysis." *Id.*

### C. Step Three.

At step three of the sequential-evaluation process, the ALJ found that Light did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 20. Specifically, that ALJ considered Listings 1.15 and 1.16 with respect to Light's spinal impairment. *Id.* at 20–21. He also mentioned numerous listings when evaluating Light's diabetes, and he considered Listing 11.14 regarding peripheral neuropathy. *Id.* at 21. The ALJ also considered SSR 19-2p with respect to Light's obesity. *Id.*

### D. The RFC.

The ALJ then determined that Light had the RFC to do light work[5] with some limitations. *Id.* at 21. He concluded that Light can only occasionally climb

---

[5] *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves

ramps and stairs, and can only occasionally balance, stoop, kneel, crouch, and

crawl. *Id*. And, the ALJ determined, Light can never climb ladders, ropes, or

scaffolds. *Id*.

In making this RFC assessment, the ALJ reviewed Light's assertions and

testimony:

> The claimant makes the following allegations regarding the
> intensity, persistence, and limiting effects of her symptoms.
> The claimant alleged disability due to diabetes and deteriorating
> L4 and L5. The claimant reported that: her impairments affect
> her ability to lift, squat, bend, stand, reach, walk, sit, kneel,
> climb stairs, remember, complete tasks, concentrate,
> understand, follow instructions, and use her hands. She does
> not handle stress or changes well. She has difficulty handling
> her personal care. She takes a lot of breaks when completing
> household chores. She cannot walk for long distances or stand
> or sit for long periods of time. She can walk a half block, and
> then she has to rest for 20 minutes. She is able to prepare small
> simple meals, wash dishes, drive, shop in stores, handle money,
> and spend time with others. The claimant testified that she has
> pain and difficulty with standing, walking, and sitting. She
> cannot climb stairs or ladders. She can walk for five minutes
> before she needs to rest, she can stand in one position for five
> minutes, and she can sit for five to ten minutes. She has
> difficult balancing. She has radiating back pain with numbness,
> tingling, and weakness in her leg, which worsened after she fell
> in February of 2021. She has difficulty bending, and she wears
> slip on shoes and no socks. She does not vacuum or sweep, and

sitting most of the time with some pushing and pulling of arm or leg controls. To
be considered capable of performing a full or wide range of light work, you must
have the ability to do substantially all of these activities. If someone can do light
work, we determine that he or she can also do sedentary work, unless there are
additional limiting factors such as loss of fine dexterity or inability to sit for long
periods of time.").

she does not take out the trash.  She naps during the day.  She is
able to shower, dress, cook, shop, do laundry, and drive.  Her
medications help, but she has side effects including sleepiness.

*Id*. at 22.[6]  The ALJ also considered the Third-Party Function Reports completed

by Light's husband, which the ALJ determined were "generally consistent" with

Light's assertions about her limitations. *Id*. at 25.  And the ALJ considered Light's

obesity. *Id*. at 23.

The ALJ further reviewed Light's medical records and treatment notes. *Id*. at

23–25.  After slipping and falling, Light reported to the emergency room in

February 2021. *Id*. at 23.  "X-rays of the hips and pelvis showed no fracture or

dislocation, small acetabular osteophytes, mild narrowing and sclerosis of the

pubic symphysis, and vacuum phenomena of both SI joints." *Id*.  And "X-rays of

the lumbosacral spine showed no acute fracture or dislocation." *Id*.  But "[t]here

was disc space narrowing at T12-L1 and L1-2[,]  [t]here were moderate sized

endplate osteophytes at T12-L2[,]  [t]here were small endplate osteophytes at L3-

5[,] [and] [t]he osseous structures were normally mineralized for age." *Id*.  The

ALJ noted that when examined, Light had "tenderness of the lumbar back and

midline." *Id*.  But "[s]he was observed to ambulate in the emergency

department[,]" and "[s]he had normal range of motion." *Id*.  After being given

Flexeril, Motrin, and Tylenol, Light was discharged from the emergency room. *Id*.

---

[6] For readability purposes, here—and elsewhere—when citing or quoting the
ALJ's decision, we omit the ALJ's citations to the record.

The ALJ then reviewed the treatment notes from Cathleen Kirkpatrick, CRNP. *Id*.  As to notes from March 31, 2021, the ALJ remarked that Light "occasionally took Cyclobenzaprine, but this caused her to be very fatigued and tired." *Id*.  Light reported that she "lost her job in security as she was missing work because she was feeling so tired or having chronic pain issues, and it was hard for her to get motivated." *Id*.  Light was also diagnosed as diabetic. *Id*.  "Examination finding were within normal limits, and she was started on Metformin and Duloxetine." *Id*.  Light "was noted to have lower extremity neuropathy, though examinations showed intact sensation." *Id*.  Light saw Kirkpatrick the next month, when she "reported continued pain, but stated that it was not as significant, and further noted she had done well with her new mediations." *Id*.  The ALJ noted that "[t]here does not appear to be further treatment until March of 2022." *Id*.

The ALJ then reviewed the records from two consultative examinations— one from Nurse Practitioner Daniel Chege and one from Dr. Ahmed Kneifati. *Id*. at 23–24.  The ALJ summarized the notes from the consultative examination of Mr. Chege:

> On July 29, 2021, the claimant underwent a consultative examination with Daniel Chege, NP.  The claimant reported having diabetes and back pain.  As for her daily activities, she indicated that she did not need help at home.  She was able to drive, cook, clean, do laundry, and do her own shopping.  She was able to bathe and dress every day.  Upon examination, the claimant was in no apparent distress.  She was not able to walk on heels and toes due to back pain, and she could not squat due

13

> to back pain.  She was able to rise from the chair without
> difficulty, she needed no help getting on and off the
> examination table, and she had normal stance and a normal gait.
> She had positive straight leg raise bilaterally.  Her joints were
> stable and nontender with no evident joint deformity.  She had
> four out of five strength in the lower extremities, and five out of
> five strength in the upper extremities.  No sensory deficit was
> noted.  No muscle atrophy was noted.  Hand and finger
> dexterity was intact.

*Id*. at 23–24.  The ALJ then summarized the notes from the consultative

examination of Dr. Kneifati:

> On January 15, 2022, the claimant underwent a consultative
> examination with Ahmed Kneifati, M.D.  The claimant reported
> having diabetes and generalized pain, worse in her lumbar
> spine.  She was observed to be using a cane.  She reported that
> she was able to cook, do laundry, and shop.  Upon examination,
> the claimant had a widened gait with short step.  She could not
> stand on her toes.  She could not walk on her heels or toes due
> to pain.  Squatting was limited to 40 percent.  Her stance was
> normal.  She declined to change for the examination.  She could
> not walk without the cane due to pain and poor balance.  She
> needed no help getting on and off the examination table.  She
> was able to rise from the chair without difficulty.  She had
> tenderness at the knees and L4-5 lumbar.  Straight leg raise was
> negative.  She had no sensory deficit and strength was full at
> five out of five in the upper and lower extremities.  Hand and
> finger dexterity was intact.

*Id*. at 24.  The ALJ also observed that although "[a]t the January 2022 consultative

examination, [Light] was noted to ambulate with a cane[,] . . . records from before

and after this examination do not note use of any assistive device." *Id*.

The ALJ also recounted Light's records from Dr. Ajitpal Grewal for pain

management.  Light had a pain management consultation with Dr. Grewal on

March 31, 2022. *Id*.  At that time, she "reported radiating low back pain[,] [and] [i]t was noted that a lumbar x-ray showed degenerative changes." *Id*.  "Her physical examination was noted to be largely unremarkable." *Id*.  That examination showed that Light "had decreased lumbar range of motion and tenderness[,]" but "[s]he had full five out of five strength, negative straight leg raise, intact sensation, and an intact gait." *Id*.  Although Light "was 'interested in getting disability and ha[d] already started paperwork[,]'" Dr. Grewal noted that "'she has not tried anything for her pain [and] therefore would not qualify for disability at this point.'" *Id*.  Dr. Grewel referred Light to physical therapy. *Id*.

In a follow-up appointment on May 26, 2022, with Dr. Grewel, Light "continued to report ongoing back pain." *Id*.  "She presented with a functional capacity evaluation form, however, Dr. Grewal informed her that he could not fill out this paperwork as she had not tried anything for her pain, and there was no clear etiology of her pain without advanced imaging." *Id*.  Light "had only gone to physical therapy once." *Id*.  Although "[s]he rated her pain at an eight out of ten[,] . . . she was observed to be in no acute distress[,] [and] [e]xamination findings remained essentially the same." *Id*.  Dr. Grewel started Light on Gabapentin, and he ordered an MRI. *Id*

Light had an MRI of her lumbar spine on June 29, 2022. *Id*.  The ALJ

summarized the findings from that MRI:

> At L3-4, there were mild degenerative changes mildly
> narrowing the canal dimensions and causing mild lower right
> neural foraminal narrowing.  There was marked spinal stenosis
> at L4-5 secondary to advanced facet hypertrophy and mild disc
> protrusion.  At L5-S1, there was right facet hypertrophy, mild
> right paracentral to lateral protrusion and moderate narrowing
> of the medial right neural foramen.  There was mild narrowing
> of the left neural foramen.

*Id*. at 24–25.

The ALJ determined that although Light's impairments cause some

limitations, her statements about her symptoms and limitations were not entirely

consistent with, or fully supported by, the medical and other evidence in the

record. *Id*. at 22, 25.  More specifically, after again recounting Light's "statements

about the intensity, persistence, and limiting effects of her symptoms," the ALJ

reasoned:

> However, she further reported that she is able to prepare meals,
> complete household chores, shop in stores, handle money, and
> drive.  The claimant does have degenerative disc disease,
> diabetes with neuropathy, and a BMI in the obese range.
> However, the record does not support further limitations than in
> the above stated residual functional capacity.  Examination did
> note a slight decrease[] in strength at four out of five in her
> lower extremities on one occasion.  On another occasion, she
> was noted to walk with a cane due to poor balance.  However,
> examination still showed that she had no sensory deficit and
> full five out of five strength in her lower extremities.  Despite
> her use of a cane at one consultative examination, the overall
> record does not indicate a cane is necessary.  It does not appear

16

the claimant's cane was prescribed.  Additionally, the records from both before and after the consultative examination where she used a cane, do not reflect the use of a cane, and additionally show the claimant had a normal gait.  Treatment records from after the consultative examination note that her physical examination were largely unremarkable, showing that she had full strength and an intact gait.  Further, the claimant received minimal treatment, and her treatment provider noted that she had not tried anything for her pain.  She attended only one physical therapy session.  Therefore, her statements about the intensity, persistence, and limiting effects of her symptoms are not fully consistent with the overall record.

*Id*. at 25.  Thus, the ALJ limited her to "light work with occasional climbing of ramps and stairs, occasional balancing, stooping, kneeling, crouching, and crawling, and no climbing of ladders, ropes, or scaffolds." *Id*. at 23.

In making the RFC assessment, the ALJ also considered the medical opinion evidence and prior administrative medical findings in the record.  The ALJ first considered the opinion of consultative examiner Dr. Miller. *Id*. at 26.  Dr. Miller opined that Light "had no limitations in the ability to make judgments on simple and complex work related decisions," and "no limitations in the ability to interact appropriately with supervisors[.]" *Id*.  He also opined that Light had "mild limitations in the ability to understand, remember, and carry out simple and complex instructions," "mild limitations in the ability to interact appropriately with coworkers and the public and mild limitations in responding appropriately to usual work situations and changes in a routine work setting." *Id*.

17

The ALJ found Dr. Miller's opinion persuasive. *Id*.  He explained that "Dr. Miller provided support for these findings, noting examination findings showing the claimant's mood and affect were anxious, her attention, concentration, and memory were mildly impaired, and her intellectual functioning appeared below average[,] but "[s]he was cooperative, her eye contact was appropriate, her speech and language were within normal limits, and her thought process was coherent and goal directed." *Id*.  The ALJ also concluded that Dr. Miller's "finding of no more than mild limitations is consistent with the overall record, which shows minimal mental health treatment and normal examination findings." *Id*.

The ALJ also addressed the findings of the state agency psychological consultants Dr. Ondis and Dr. Gavazzi, who found that Light's "mental health impairments were nonsevere, noting from no to mild limitations in understanding, remembering, and applying information, interacting, concentrating, persisting, and maintaining pace, and adapting or managing oneself." *Id*.  The ALJ concluded that those findings were persuasive. *Id*.  He explained that the "State agency consultants provided support for these findings, noting the claimant was taking psychotropic agents, but did not otherwise participate in mental health treatment, and mental status examination was within normal limits." *Id*.  The ALJ also concluded that "these findings are consistent with the overall record, which shows there is some mention of anxiety and depression in the record, however, there is

minimal treatment, and the consultative examination was overall within normal limits." *Id*.

The ALJ also addressed the findings of the state agency medical consultant Dr. Bilynsky, who "found that the claimant had a light residual functional capacity, could never climb ladders, ropes, or scaffolds, occasionally climb ramps and stairs, and occasionally balance, stoop, kneel, crouch, and crawl, and must avoid concentrated exposure to extreme cold, wetness, vibration, and hazards." *Id*. The ALJ concluded that those findings were partially persuasive. *Id*. He explained that "Dr. Bilynsky provided some support for these findings, noting the claimant's lumbar spine and hip degeneration, decreased range of motion, positive straight leg raise, BMI, and normal gait and stance." *Id*. The ALJ also addressed the consistency of Dr. Bilynsky's findings concluding that they "are partially consistent with the overall record[,]" but concluding that contrary to Dr. Bilynsky's findings "the record does not establish any environmental limitations." *Id*. The ALJ explained that Light "was observed to have full strength, intact gait, and intact sensation[,] that "[o]n another occasion, she was observed to rise from a chair without difficulty, [that] she needed no help getting on and off the examination table, [that] she had normal stance and a normal gait[,]" and that "[n]o sensory deficit was noted." *Id*.

The ALJ also addressed the findings of the state agency medical consultant Dr. Arnold, who on reconsideration of Light's claims, found that Light "had a light residual functional capacity and could occasionally climb ladders, ropes, scaffolds, ramps, and stairs, and occasionally balance, stoop, kneel, crouch, and crawl." *Id*. The ALJ concluded that those findings were persuasive. *Id*.  He explained that "Dr. Arnold provided support for these findings, noting the claimant's lumbar spine degenerative disc disease, degenerative changes of the hips and pelvis, and BMI, along with examinations showing full strength, no muscle atrophy, intact sensation, and no evident joint deformity." *Id*. at 26–27.  The ALJ also concluded that Dr. Arnold's "findings are consistent with the overall record, which shows the claimant is somewhat limited [by] degenerative disc disease, diabetes and neuropathy, and a BMI in the obese range, however, she is not as limited as alleged, and the overall record shows minimal findings and treatment." *Id*. at 27.

The ALJ next considered the opinion of consultative examiner Nurse Practitioner Chege, who opined that Light "could lift and/or carry 20 pounds occasionally and ten pounds frequently, sit for five hours, stand for four hours, and walk for four hours at one time, sit for eight hours, stand for eight hours, and walk for eight hours total[.]" *Id*.  He also opined that Light could "frequently reach, handle, finger, and feel, occasionally push/pull, frequently operate foot controls, frequently climb and kneel, occasionally balance, stoop, crouch, and crawl, and

frequently tolerate exposure to hazards, operating a motor vehicle, humidity, wetness, pulmonary irritants, extreme temperatures, and vibrations." *Id*.

The ALJ found Mr. Chege's opinion not persuasive. *Id*.  He addressed the supportability of the opinion concluding that "Mr. Chege did provide some support for these findings, noting the claimant had positive straight leg raise, she could not walk on her heels or toes, and she had a slight decrease in strength in her lower extremities." *Id*.  But the ALJ concluded that "he did not provide support for the findings of limitations in reaching, handling, fingering, and feeling, noting the claimant had full strength in the upper extremities, no sensory deficit, and intact hand and finger dexterity." *Id*.  The ALJ also addressed the consistency of the opinion with the other evidence in the record concluding that Mr. Chege's "findings are not fully consistent with the overall record." *Id*.  In this regard, the ALJ noted that "[t]he record does not indicate the claimant is as limited in sitting, standing, or walking at one time, there does not appear to be support for environmental limitations or for limitations regarding reaching, handling, fingering, feeling, pushing, pulling, or operation of foot controls." *Id*.  He further noted that "[t]he overall record shows minimal treatment and generally normal examination findings showing the claimant had intact sensation, negative straight leg raise, full strength, and a normal gait." *Id*.

21

The ALJ then considered the opinion of consultative examiner Dr. Kneifati, who opined that Light "could lift and/or carry up to ten pounds occasionally, sit for one hour, stand for 20 minutes, and walk for 20 minutes at one time, sit for five hours, stand for three hours, and walk for two hours total[.]" *Id.*  He also opined that Light "requires the use of a cane to ambulate and this is medically necessary[.]" *Id.*  He further opined the Light "can frequently operate foot controls, occasionally climb stairs and ramps, stoop, kneel, crouch, and crawl, never climb ladders or scaffolds, never balance, never tolerate exposure to unprotected heights, occasionally tolerate exposure to moving mechanical parts, operation of a motor vehicle, humidity, wetness, and extreme temperatures." *Id.*

The ALJ found Dr. Kneifati's opinion not persuasive. *Id.*  He addressed the supportability of the opinion concluding that "Dr. Kneifati provided some support for these findings, noting the claimant presented to the examination with a cane, she had a widened gait with a short step, she could not stand on her toes or walk on her heels or toes, and her squatting was limited." *Id.*  The ALJ noted, however, that although Dr. Kneifati indicated that the claimant had poor balance, that opinion appeared to be based on Light's self-report. *Id.*  And the ALJ points out that Light "was observed to rise from a chair without difficulty, . . . she got on and off the examination table without assistance[,] [s]he had intact sensation and full strength in her lower extremities." *Id.*  The ALJ addressed the consistency of the opinion

22

with the other evidence in the record concluding that "Dr. Kneifati's findings regarding lifting, carrying, standing, walking, sitting, operation of foot controls, and environmental limitations are not consistent with the overall record" *Id*. The ALJ reasoned that although Light "does have degenerative disc disease, diabetes, and a BMI in the obese range[,] . . . her treatment provider noted that she had not tried anything for her pain[,] [and] [e]xaminations generally showed that she had intact sensation, full strength, and a normal gait." *Id*.

Finally, the ALJ acknowledged Ms. Kirkpatrick's conclusion that Light "was temporarily disabled and precluded from any gainful employment starting March 31, 2022, and expected to last through December 31, 2022," as well as Dr. Grewels' statement that Light "would not qualify for disability at this point." *Id*. at 28. The ALJ concluded that '[t]hese are statements on issues reserved to the Commissioner and are inherently neither valuable nor persuasive." *Id*.

The ALJ summarized the basis for his determination that Light has the RFC to perform light work with limitations:

> . . . The above residual functional capacity assessment is supported by the objective medical evidence, which does not corroborate the claimaint's allegations, and by the claimant's reported activities of daily living, which also contradict her allegations. According to the objective evidence, the claimant's impairments are not as limiting as she alleges. The undersigned has considered all allegations, testimony, and evidence in making this determination.

*Id*. at 28.

### E.  Step Four.

At step four of the sequential-evaluation process, the ALJ found that Light could perform her past relevant work as a sales attendant and a security guard. *Id*. at 28.  The ALJ observed that although the vocational expert testified that Light's past relevant work as a sales attendant clerk was classified as light work, Light actually performed that work at the medium exertional level. *Id*.  And comparing Light's RFC "with the physical and mental demands of this work," the ALJ concluded that Light "is able to perform the sales attendant job as generally performed and the security guard job as actually and generally performed." *Id*.

Because the ALJ concluded at step four that Light could perform her past relevant work, the ALJ did not need to—and did not—address step five of the sequential-evaluation process.  The ALJ concluded that Light was not disabled from March 18, 2021 (which is the alleged onset date), through the date of the ALJ's decision on August 4, 2022. *Id*. at 29.  Thus, he denied Light's claims for benefits. *Id*.

## V. Discussion.

The brief filed by Light is unfocused and touches on many issues. *See doc. 9* (passim).[7]  But Light explicitly sets forth the following three claims: (1) that the ALJ erred and abused his discretion by failing to consider in the RFC limitations from her lumbar degenerative disc disease, diabetes mellitus with neuropathy, and obesity, which he determined to be severe impairments; (2) that the ALJ erred and abused his discretion by failing to consider in the RFC limitations from her rheumatoid arthritis, psoriasis, depression, poor balance, and bilateral knee pain, which he either considered to be non-severe impairments or barely mentioned; and (3) that the ALJ erred and abused his discretion by failing to assign proper weight to the opinions of the medical consultative physicians as compared to the opinions of the state agency consultants. *Id.* at 1–2.[8]  Because claims one and two both deal

---

[7] In addition to being unfocused, Light's brief incorrectly asserts that the ALJ denied the claims at Step 5. *See Doc. 9* at 7.  At points, the brief also confuses the steps of the five-step sequential evaluation. *See e.g., id.* (after incorrectly stating that the ALJ denied the claims at Step 5, confusing Steps 3 and 4 by asserting that the claims were "also denied at Step 4, by the ALJ, who determined that Claimant's severe impairments did not meet any of the Listings"); *id.* (confusing the date last insured with Step 1); *id.* (confusing Steps 1 and 2 by asserting that "[a]t step 2, the ALJ found that Claimant has not engaged in substantial gainful activity since March 18, 2021, her alleged onset date"); *id.* at 7–8 (confusing Steps 2 and 3 by asserting that at Step 3 the ALJ found that Light has severe impairments).

[8] In the argument section of her brief, Light sets forth that the ALJ must consider whether a claimant's impairments satisfy the criteria of a listed impairment. *Doc. 9* at 12.  Light makes no argument, however, regarding any

with the RFC, we address those claims together.  But because how the ALJ's

assessed the opinion evidence informed his RFC determination, we first address

Light's claim regarding the opinion evidence.  For the reasons discussed below, we

conclude that Light's claims are without merit.

### A. The ALJ did not err in his consideration of the opinion evidence.

We first address Light's claim regarding the ALJ's treatment of the opinion

evidence.  We start with a brief overview of the regulations regarding opinion

evidence.  The regulations in this regard are different for claims filed before March

27, 2017 ("old regulations"), on the one hand, and for claims, like Light's, filed on

or after March 27, 2017 ("new regulations") on the other hand.  The new

regulations applicable here have been described as a "paradigm shift" in the way

medical opinions are evaluated. *Mercado v. Kijakazi*, 629 F. Supp. 3d 260, 279

(M.D. Pa. 2022).  Under the old regulations, "ALJs were required to follow

regulations which defined medical opinions narrowly and created a hierarchy of

---

listings.  Thus, she has forfeited any argument regarding Step 3 and the listings.
Similarly, Light sets forth some law regarding the Step 2 analysis. *Id*. at 20–21.
But Light has not explicitly argued that the ALJ erred at Step 2.  Thus, she has
forfeited any argument regarding Step 2.  Moreover, at Step 2, the ALJ determined
that Light had severe impairments, and he proceeded past the step-two analysis.
*Admin. Tr.* at 17–20.  In such circumstances, any error by the ALJ in concluding
that a particular impairment was not severe is harmless error. *Salles v. Comm'r of
Soc. Sec.*, 229 F. App'x 140, 145 n.2 (3d Cir. 2007) ("Because the ALJ found in
Salles's favor at Step Two, even if he had erroneously concluded that some of her
other impairments were non-severe, any error was harmless.").

medical source opinions with treating sources at the apex of this hierarchy." *Id*. at
280.  But under the new regulations, "[t]he range of opinions that ALJs were
enjoined to consider were broadened substantially, and the approach to evaluating
opinions was changed from a hierarchical form of review to a more holistic
analysis." *Id*.

Further, under the old regulations, the ALJ assigns the weight he or she
gives to a medical opinion. 20 C.F.R. §§ 404.1527(c), 416.967(c).  Under the new
regulations, however, the ALJ evaluates the persuasiveness of medical opinions
and prior administrative medical findings using the following factors:
(1) supportability, (2) consistency, (3) relationship with claimant,
(4) specialization, and (5) other factors. 20 C.F.R. §§ 404.1520c(c), 416.920c(c).
The most important factors are supportability and consistency. 20 C.F.R.
§§ 404.1520c(a), 416.920c(a).  The ALJ must explain how he or she "considered
the supportability and consistency factors for a medical source's medial opinions
or prior administrative medical findings in" his or her determination or decision. 20
C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).  The ALJ may, but is not required to,
explain how he or she considered the remaining three factors in determining the
persuasiveness of a medical opinion. 20 C.F.R. §§ 404.1520c(b)(2),
416.920c(b)(2).  But if there are two equally persuasive medical opinions about the

same issue that are not exactly the same, then the ALJ must explain how he or she considered the other factors. 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3).

Supportability and consistency are defined in 20 C.F.R. §§ 404.1520c(c), 416.920c(c).  As the regulations provide, supportability means: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). "Simply put, supportability is an inquiry geared toward assessing how well a medical source supported and explained their opinion(s)." *Acosta Cuevas v. Commissioner of Social Security*, No. 20-CV-0502, 2021 WL 363682, at *10 (S.D.N.Y. Jan. 29, 2021*), adopting report and recommendation*, 2022 WL 717612, at *1 (S.D.N.Y. Mar. 10, 2022).  On the other hand, consistency means: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).  The consistency factor focuses on "how well a medical source is supported, or not supported, by the entire

28

record." *Acosta Cuevas*, 2021 WL 363682, at *10.  Against this backdrop, we

address the ALJ's consideration of the opinion evidence.[9]

Light contends that the ALJ failed to examine the opinions of the

consultative examiners using the factors sets under the new regulations.[10]  But as

the earlier summary of the ALJ's decision shows, the ALJ addressed the

supportability and consistency of each opinion in the record, including those of the

consultative examiners Mr. Chege and Dr. Kneifati. *See Admin. Tr.* at 26–28.  And

as to the factors other than supportability and consistency, the ALJ need only

explicitly explain how he or she considered those factors if there are two equally

persuasive medical opinions about the same issue that are not exactly the same. *See*

20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3).  Light contends that the ALJ should

have accepted the opinions of Mr. Chege and Dr. Kneifati over the opinions of the

state agency consultants.  The ALJ found, however, the opinions of Mr. Chege and

Dr. Kneifati not persuasive, while he found the opinions of the state agency

consultants persuasive or partially persuasive.  Thus, the ALJ did not find the

_____

[9] Although Light contends that the ALJ erred in failing to include limitations in the RFC that the consultative examiners opined she had, and she asserts that "the ALJ did not provide any examination of the opinions set forth in the CE reports using the facts under 20 C.F.R. § 404.1520c[,]" she nevertheless continues to argue that the ALJ erred and abused his discretion with respect to the weight he assigned to the opinion evidence. *See doc. 9* at 22–28 (underlining in original).  Although not always properly framed, we will consider Light's assertions regarding the ALJ's treatment of the opinion evidence under the new regulations.

[10] *See supra*. note 9.

medical opinions equally persuasive such that he was required to explicitly discuss the factors other than supportability and consistency.

Further, "[s]urveying the medical evidence to craft an RFC is part of the ALJ's duties." *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006). And "[i]n evaluating medical reports, the ALJ is free to choose the medical opinion of one doctor over that of another." *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 505 (3d Cir. 2009). In fact, in evaluating the medical opinion evidence of record, "the ALJ is not only entitled but required to choose between" conflicting medical opinions. *Cotter*, 642 F.2d at 705.

Here, that is what the ALJ did. Light contends, however, that the ALJ erred by giving no weight to the opinions of Mr. Chege and Dr. Kneifati while assigning persuasive weight to the opinions of the state agency consultants. But the ALJ did not assign weight to any of the medical opinions. Rather, in accordance with the new regulations, he addressed the persuasiveness of each opinion. And he explained why he found some opinions persuasive or partially persuasive and others not persuasive. He also adequately explained how he considered the supportability and consistency of those opinions.

Light also highlights that the state agency consultants did not examine her, and without identifying specific records, she contends that they rendered their opinions without the benefit of many of the medical records in this case. But the

opinions of state agency consultants "merit significant consideration." *Chandler v. Commissioner of Social Security*, 667 F.3d 356, 361 (3d Cir. 2011). And "because state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision." *Id.* Further, the mere fact that some additional medical evidence is received after the agency consultant's report does not necessarily mean that the ALJ may not rely on the agency consultant's opinions. *Id.* Here, the ALJ appropriately considered the opinions of the state agency consultants, and he explained why he found their opinions persuasive or partially persuasive.

In sum, the ALJ did not err in the treatment of the opinion evidence, and his decision in this regard is supported by substantial evidence.

### B.  The ALJ did not err by failing to impose additional limitations in the RFC.

Light claims that the ALJ erred and abused his discretion in formulating her RFC by failing to include additional limitations in the RFC. Before addressing Light's specific arguments, we set forth the standards regarding the RFC assessment in general.

"The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations." *Chandler*, 667 F.3d at 361. The RFC is "'that which an individual is still able to

31

do despite the limitations caused by his or her impairment(s).'" *Burnett*, 220 F.3d at 121 (quoting *Hartranft*, 181 F.3d at 359 n.1).  In assessing a claimant's RFC, the ALJ must consider all the evidence of record. *Burnett*, 220 F.3d at 121.  "When a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (quoting *Mason*, 994 F.2d at 1066).  The court's "review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence." *Wilder v. Kijakazi*, 1:20-CV-492, 2021 WL 4145056, at *6 (M.D. Pa. Sept. 9, 2021); *see also Burns v. Barnhart*, 312 F.3d 113, 129 (3d Cir. 2002) ("We examine the ALJ's conclusions as to [the claimant's] residual functional capacity with the deference required of the substantial evidence standard of review.").

As set forth above, "[s]urveying the medical evidence to craft an RFC is part of the ALJ's duties." *Titterington*, 174 F. App'x at 11.  And "[i]n evaluating medical reports, the ALJ is free to choose the medical opinion of one doctor over that of another." *Diaz*, 577 F.3d at 505.

Further, in setting the RFC, the ALJ must clearly articulate his or her reasoning.  In other words, the ALJ must "set forth the reasons for his decision" to allow for meaningful judicial review. *Burnett*, 220 F.3d at 119 (citing *Cotter*, 642 F.2d at 704–05).  Although an ALJ need not "use particular language or adhere to a

particular format in conducting his analysis," the ALJ must ensure "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004).  The ALJ's decision must set out "a clear and satisfactory explication of the basis on which it rests." *Cotter*, 642 F.2d at 704.  If an ALJ "has not sufficiently explained" how he or she considered all the evidence "'to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Dantzler v. Saul*, No. 3:16-CV-2107, 2019 WL 5569466, at *1 (M.D. Pa. Oct. 28, 2019) (quoting *Dobrowolsky v. Califano*, 606 F.2d 403, 407 (3d Cir. 1979)).

Applying the above standards to the present record, we conclude that the ALJ's RFC determination is supported by substantial evidence.  First, contrary to Light's suggestion otherwise, the ALJ considered the record as a whole.  The ALJ thoroughly explained his decision to limit Light to light work with some limitations.  And, as detailed above, in making his RFC assessment, the ALJ reviewed Light's assertions and testimony regarding her impairments and limitations, her husband's reports, the medical records, the opinion evidence, and Light's daily activities.  In sum, the ALJ considered the record as a whole.

In support of her assertion that the ALJ failed to include more substantial limitations in her RFC, after recounting some of her medical records, Light asserts

that the ALJ failed to note "many of these records and issues" raised in those records. *Doc. 9* at 15.  It is a litigant's duty to point to specific parts of the record that support his or her contentions; it is not the Court's job to comb through the record looking for evidence to support the claims. *Cf. United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").  But here Light fails to point to which records the ALJ allegedly failed to consider.  Moreover, after reviewing the record and the ALJ's decision, we are satisfied that the ALJ sufficiently addressed the medical evidence, and he adequately explained the rationale for his decision.

Light contends that the ALJ erred in failing to properly consider limitations regarding her ability to walk, sit, stand, lift, and carry, as set forth in the opinion of Dr. Kneifati, and which, according to Light, are supported by the medical evidence.  But as already addressed, the ALJ considered the differing medical opinions and reasonably explained why he found Dr. Kneifati's opinion regarding Light's limitations not persuasive.  In a similar vein, Light contends that based on the opinions of Dr. Kneifati and Mr. Chege, the ALJ should have found her disabled under the Grid Rules.  But again, the ALJ explained why he found Dr. Kneifati and Mr. Chege's opinions not persuasive.  Thus, the ALJ did not err in this regard.

Light also contends that the ALJ should have included more significant non-exertional limitations in her RFC based on her depression, which she asserts limits her ability to concentrate and focus on a regular basis.  In this regard, she cites to the report of consultative examiner Dr. Miller, who noted the Light had an anxious mood and affect, "mildly impaired" attention and concentration "due to anxiety in the evaluation," "mildly impaired" recent and remote memory skills "due to anxiety in the evaluation," and below average intellectual functioning. *See Admin. Tr.* 518.  And she contends that the ALJ failed to explain how he considered her depression and its impact on her ability to attend work on a sustained basis and to remain on task or her need for unscheduled breaks.

But the ALJ did consider Light's depression at both at Step 2 and in connection with setting the RFC.  At Step 2, the ALJ found that Light's depression was not severe. *See Admin. Tr.* at 18.  In making that determination the ALJ considered Light's assertions, the fact that the "record reflects little in the way of complaints or treatment for mental health impairments," and the psychological examination of Dr. Miller. *Id.* at 18–19.  And he specifically found that Light had only mild limitations in the "four broad functional areas" "known as the 'paragraph B' criteria," one of which is concentrating, persisting, or maintaining pace. *Id.* at 19–20.  The ALJ recognized that the "paragraph B" criteria are not an RFC; rather, they "are used to rate the severity of mental impairments at steps 2 and 3 of the

35

sequential evaluation process[,]" and the RFC "assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment." *Id*. at 20. And he asserted that his RFC that follows "reflects the degree of limitation" he "has found in the 'paragraph B" mental function analysis." *Id*.

And when setting the RFC, the ALJ acknowledged Light's assertions regarding her ability to concentrate and complete tasks. *Id*. at 22.  He also considered the opinion of Dr. Miller persuasive, who opined that Light "had no limitations in the ability to make judgments on simple and complex work related decisions," "no limitations in the ability to interact appropriately with supervisors," "mild limitations in the ability to understand, remember, and carry out simple and complex instructions," "mild limitations in the ability to interact appropriately with coworkers and the public and mild limitations in responding appropriately to usual work situations and changes in a routine work setting." *Id*. at 26.  The ALJ found Dr. Miller's opinion persuasive. *Id*.  And the ALJ observed that "Dr. Miller provided support for these findings, noting examination findings showing the claimant's mood and affect were anxious, her attention, concentration, and memory were mildly impaired, and her intellectual functioning appeared below average[,] but "[s]he was cooperative, her eye contact was appropriate, her speech and language were within normal limits, and her thought process was coherent and goal directed." *Id*.  The ALJ also concluded that Dr. Miller's "finding of no more

36

than mild limitations is consistent with the overall record, which shows minimal mental health treatment and normal examination findings." *Id*.

In setting the RFC, the ALJ also addressed, and found persuasive, the findings of the state agency psychological consultants Dr. Ondis and Dr. Gavazzi, who found that Light's "mental health impairments were nonsevere, noting from no to mild limitations in understanding, remembering, and applying information, interacting, concentrating, persisting, and maintaining pace, and adapting or managing oneself." *Id*.  The ALJ determined that the "State agency consultants provided support for these findings, noting the claimant was taking psychotropic agents, but did not otherwise participate in mental health treatment, and mental status examination was within normal limits." *Id*.  He also concluded that "these findings are consistent with the overall record, which shows there is some mention of anxiety and depression in the record, however, there is minimal treatment, and the consultative examination was overall within normal limits." *Id*.

In sum, the ALJ addressed Light's depression, and he concluded that her depression was not severe and would not affect her ability to sustain employment. The ALJ adequately explained his reasoning, and his decision in this regard is supported by substantial evidence.

Light also asserts that it is "reasonable to believe that [she] would miss work after a couple of consecutive days of work, as exerting herself during the week

would result in an increase in the limitations from her severe impairments that would get worse for her as the week progresses." *Doc. 9* at 19–20.  But she provides no support for that assertion, and, to the extent it is generally based on Light's assertions regarding her limitations, the ALJ adequately addressed the evidence in the record and explained why he did not find that Light's impairments were as limiting as she asserts.

Light further mentions that "the ALJ erred and abused his discretion by fail[ing] to properly consider using a Medical Expert in this matter, due to the conflicting nature of the opinions of the Medical Consultative Exam Physicians, in terms of one holding Claimant to the light exertional level, and the other to the sedentary exertional level, particularly in light of the impact upon the grid rules given Claimant's past relevant work." *Doc. 9* at 18–20.  She fails, however, to develop an argument for when a medical expert is necessary.  Moreover, there was substantial opinion evidence in the record, and, as already discussed, the ALJ addressed that evidence and chose which evidence he found persuasive and which he found non persuasive, as he is required to do when determining the RFC.

Light also asserts that the ALJ should have considered that she was fired from her job as a security guard due to pain-related issues.  The ALJ did, however, acknowledge Light's assertion that "she had lost her job in security as she was

38

missing work because she was feeling so tired or having chronic pain issues, and it was hard for her to get motivated." *Admin. Tr.* at 23.

Similarly, Light contends that the ALJ failed to consider the effects of her rheumatoid arthritis, psoriasis, poor balance, and bilateral knee pain. *Doc. 9* at 21. The ALJ did, however, acknowledge these issues. *See Admin. Tr.* at 18 (concluding at Step 2 that Light's psoriasis, knee pain, and rheumatoid arthritis were not severe and explaining why he so concluded); *id.* at 22, 25 (noting when setting the RFC that Light asserted difficulties with, among other things, standing, walking, sitting, and balancing); *id.* at 24, 25 (addressing when setting the RFC, Light's use of a cane for balance); *id.* at 27 (addressing Dr. Kneifati's opinion that Light had poor balance). And as explained earlier, in setting the RFC, the ALJ reviewed Light's assertions regarding her limitations, her husband's assertions regarding the same, her activities of daily living, the medical records, and the opinion evidence, explaining why he accepted certain evidence over other evidence. While Light contends that the evidence supports additional limitations, and she suggests that the court accept her analysis of the evidence over the analysis set forth by the ALJ, we cannot reweigh the evidence. *Chandler*, 667 F.3d at 359 ("Courts are not permitted to re-weigh the evidence or impose their own factual determinations."); *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005) ("In the process of reviewing the record for substantial evidence, we may not 'weigh the evidence or substitute [our

own] conclusions for those of the fact-finder.'" (citation omitted)).  And "[t]he presence of evidence in the record that supports a contrary conclusion does not undermine the Commissioner's decision so long as the record provides substantial support for that decision." *Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x 761, 764 (3d Cir. 2009).  Here, the ALJ fulfilled his duty in evaluating the evidence and explaining why he chose to credit some evidence over other evidence.

In summary, we conclude that the ALJ did not err in connection with determining Light's RFC, and his decision regarding Light's RFC is supported by substantial evidence.

## VI.  Conclusion.

For the foregoing reasons, we will affirm the decision of the Commissioner. An appropriate order follows.

<u>**S/Susan E. Schwab**</u>
Susan E. Schwab
United States Magistrate Judge